UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| In re: | |
|---|---|
| EDWARD CHAN PARK, | Case No. 06-11831-RGM (Chapter 7) |
| Debtor. | |
| BRANCH BANKING & TRUST COMPANY, | |
| Plaintiff, | |
| vs. | Adv. Proc. No. 07-1024 |
| EDWARD CHAN PARK, | |
| Defendant. | |

**MEMORANDUM OPINION**

THIS CASE was before the court on November 1, 2007, for a trial on the complaint of Branch Banking & Trust Company ("BB&T"). The complaint asserts that two cash advances taken by the debtor against a credit line issued by BB&T should be declared nondischargeable under Bankruptcy Code §523(a)(2)(A) and (C). The court has jurisdiction under 28 U.S.C. §1334(b) over this adversary proceeding, which is a core matter under 28 U.S.C. §157(b)(2)(I). The court considered the pleadings, evidence, and arguments by the parties at trial, and makes the following findings of fact and conclusions of law.

**Findings of Fact**

The debtor and BB&T entered into a Preferred Line Agreement & Initial Disclosure Statement (the "Agreement") on May 3, 2002, pursuant to which BB&T agreed to provide the debtor

1

with an unsecured line of credit in the amount of $50,000.00. The debtor was obligated to make monthly interest-only payments on any outstanding balance under the line of credit. Dorothy Holland, BB&T's corporate designee and the bank employee who made the loan, testified that the credit line provided under the Agreement was a consumer product that contemplated repeat transactions between the parties. BB&T provided the debtor with checks to access the line of credit. By January 4, 2006, the debtor had drawn on the credit line, but had paid the balance down to zero and in fact overpaid it by approximately $200.

The debtor's primary business is as a construction contractor specializing in trimming work. In 2005, the debtor's business generated net income of $37,354 on gross revenue of $122,490. The debtor's contracting business deteriorated markedly in 2006. The debtor's 2006 tax return shows gross business revenue of only $10,770, and no net business income. The debtor testified to several reasons for this downturn in the contracting business. First, he did not have much work because the slowdown in the real estate business lessened the demand for his services. Second, the debtor opened a new retail venture with his wife and daughter at the start of 2006 that took his attention away from the contracting work. Finally, the debtor and his wife were litigating a contentious divorce during 2006.

The debtor, his wife and daughter founded CCM Mom's Place t/a Morning Glory, a combination station and gift items retail store that opened for business on January 18, 2006. The capital for this new business came from the debtor, who borrowed heavily on his lines of credit, and his daughter, who incurred $20,000 to $30,000 in personal debt related to the business. The debtor and his family also refinanced their home in 2005 to provide capital for the business. The debtor's daughter managed the day-to-day operations of Morning Glory. Unfortunately, Morning Glory

2

stumbled from the very beginning and did not succeed.

Starting in mid-October 2006, Morning Glory was put on the market. The debtor worked with a realtor to sell the business by advertising to the Korean market in native language newspapers. The debtor ran more than a dozen newspaper advertisements, offering the business, the store lease, and the inventory for $135,000. The debtor and his daughter testified that they were optimistic at the start because there was interest among prospective purchasers when the store was first put on the market.[1] However, no sale materialized. The landlord ultimately released Morning Glory from its lease obligation, and the store ceased operations by March 31, 2007.

During part of 2006, while running his construction contracting business and helping to open Morning Glory, the debtor and his wife became involved in a divorce proceeding. The debtor retained The Metropolitan Law Group, L.L.C. in March or April 2006 to represent him in the divorce. The debtor paid his divorce attorneys regular amounts for services rendered during 2006.

Because the debtor did not generate much business income in 2006, he relied heavily on several lines of credit to provide regular income. An examination of the debtor's bank statements shows large, regular deposits from March through November 2006, aggregating approximately $57,000.[2] The debtor testified that these deposits were funded by drawing on his various lines of credit. These monies were used to pay for the family's living expenses, to pay for the debtor's

---

[1] The debtor lacks English proficiency. As a result, his daughter, Christine Park, often participated in phone calls and meetings with BB&T and other parties as an interpreter for her father. The debtor, his daughter, and BB&T's corporate representative testified extensively at trial to Ms. Park's involvement with and knowledge of the debtor's finances and business dealings. The court finds Ms. Park's testimony to be credible and relevant as to the events that precipitated the debtor's bankruptcy and the debtor's personal and business financial condition.

[2] The bank statement shows the following large deposits starting in March 2006: $2,000 in March; $10,000 in May; $10,000 in June; $18,000 in July; $10,000 in August; $6,431.25 in September; $17,000 in October; and $3,000 in November.

attorneys' fees, and, in some cases, to refinance other debt. Some of the money was also used to operate the debtor's contracting and retail businesses.

The $57,000 in deposits include the $17,000 from the BB&T line of credit that is at issue in this case. On October 21, 2006, the debtor wrote check number 1005 against his BB&T credit line in the amount of $10,000 and deposited it in his personal checking account. This deposit cleared the debtor's bank on October 23, 2006. Later that month, on October 28, 2006, the debtor wrote check number 1006 against his BB&T credit line in the amount of $7,000 and deposited it in his personal checking account. This second deposit cleared the debtor's bank on October 30, 2006. The debtor testified that, while he could not specifically trace the $17,000 because it became commingled with other funds in this checking account, the money was used primarily to pay for personal expenses, such as living expenses and the mortgage, and to service other debt.

The debtor testified that while he was getting deeper into debt in 2006, he always intended to repay the amounts borrowed. Later in the year, when the success of Morning Glory had not materialized, he believed he could substantially pay down his debts with the sale of Morning Glory and the marital home, and service the balance, paying it over time. Additionally, around the time the debtor borrowed $17,000 against his BB&T line of credit in late October 2006, the debtor's contracting business, C&H Carpentry, Inc., entered into a contract with Toll Brothers, Inc., to provide finish carpentry work. The contract had been discussed for a period of time. The contract was signed by the debtor on October 26, 2006, and countersigned by Toll Brothers on or about October 30, 2006. The debtor and his daughter testified that they met with the project manager and assistant project manager on the new Toll Brothers contract and expected to generate more than $500,000 in income over three years from the contract. Although the debtor was never called to

4

perform under the contract and the project was delayed after the initial expected groundbreaking in December 2006, the debtor reasonably expected to generate significant revenue from the Toll Brothers contract. The contract was terminable on 48 hours notice, but Toll Brothers has not exercised the right to terminate. There is no evidence that the contract was illusory or that the debtor's expectations of substantial income related to the contract were unfounded. In fact, the executed agreement and the debtor's and his daughter's testimony point to a legitimate, arms-length contract under which Toll Brothers anticipated assigning a significant amount of carpentry work to the debtor's business. The material change in the real estate market frustrated the debtor's expectations with Toll Brothers.

The failure of Morning Glory and the lack of revenue from the Toll Brothers contract contributed to the debtor's worsening financial condition in the final two months of 2006. The debtor filed his chapter 7 petition on December 28, 2006. The debtor testified that he began consulting with the Metropolitan Law Group, also his attorneys in the divorce proceeding, about the possibility of seeking bankruptcy relief around early December 2006. Although BB&T contends that the debtor contemplated filing for bankruptcy as far back as April 2006 when he first engaged the Metropolitan Law Group, the debtor's unrebutted testimony and the corroborating evidence show that he did not consider filing bankruptcy until November and did not decide to file bankruptcy until December. The debtor's certificate of credit counseling shows he took the course on November 23, 2006. The debtor's petition shows he paid $2,500 to the Metropolitan Law Group on December 20, 2006 for bankruptcy-related services. This case was filed on December 28, 2006. [3]

---

[3] The debtor first consulted the Metropolitan Law Group when his divorce became imminent or commenced. He testified that most of the legal services rendered by Metropolitan Law Group from that date until he filed his bankruptcy petition were divorce-related.

Despite the debtor's worsening financial circumstances, he continued to make payments on his outstanding debts. The debtor's bankruptcy schedules show that in the 90 days prior to filing bankruptcy, he paid $4,969.80 to credit card companies and lenders, including payments on the BB&T line of credit aggregating $524.94. There is no evidence that the debtor defaulted on his obligations on the BB&T line of credit prior to filing bankruptcy, and in fact, Ms. Park testified that BB&T never called the loan for full payment. These payments support the debtor's testimony that he intended to pay his debts at the time he took the cash advances. The payments cost the debtor money at a time when money was in precious demand and are consistent with his stated intent to pay his debts by liquidating his assets and paying the balance, if any, over time from the Toll Brothers' contract.

## Conclusions of Law

BB&T seeks a declaration that the $17,000 the debtor drew on his line of credit in October 2006 is non-dischargeable under the §523(a)(2)(A) as a debt "obtained by false pretenses, a false representation, or actual fraud." The bank relies principally on the presumption of non-dischargeability created by §523(a)(2)(C)(i)(II) for "cash advances aggregating more than $750 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 70 days before the order for relief."[4]

In order to invoke the presumption, BB&T must demonstrate by a preponderance of the

---

[4] The Bankruptcy Code provides for triennial inflation-indexed adjustments to certain dollar amounts in the Code. *See* Bankruptcy Code §104(b). On February 7, 2007, the Judicial Conference of the United States adjusted the dollar amount in §523(a)(2)(C)(i)(II), the provision at issue here, from $750 to $825. This change does not apply, however, to cases commenced before April 1, 2007. *See* Revision of Certain Dollar Amounts in the Bankruptcy Code, 72 Fed. Reg. 7,082 (Feb. 14, 2007). The debtor filed his chapter 7 petition on December 28, 2006, prior to the effective date of the latest increase. Therefore, this proceeding is governed by the pre-adjustment $750 figure.

6

evidence that it has satisfied all the criteria set forth in §523(a)(2)(C)(i)(II).  *See, e.g.*, *GE Money Bank v. LaBovick (In re LaBovick)*, 355 B.R. 508, 515 (Bankr.W.D.Pa. 2006).  The debtor concedes that BB&T is entitled to the presumption.[5]

The presumption of non-dischargeability, like all other presumptions, merely shifts the burden of producing evidence to the opposing party, in this case, the debtor.[6]  In order to rebut the presumption of non-dischargeability, the debtor must "raise a substantial doubt in the mind of the trier of fact as to the existence of the presumed intent [to defraud the creditor]."  *FCC Nat'l Bank v. Orecchio (In re Orecchio)*, 109 B.R. 285, 290 (Bankr.S.D.Ohio 1989); *see also Signet Bank/Va. v. Rawoot*, 14 F.3d 596, 1993 WL 514935, *1 (4th Cir. Dec. 10, 1993), *cert. denied*, 511 U.S. 1070

---

[5] Each of the two cash advances at issue—the $10,000 cash advance obtained by the debtor on October 23, 2006 and the $7,000 cash advanced obtained on October 30, 2006—are extensions of credit obtained on or within 70 days of the debtor's bankruptcy petition on an open ended credit plan aggregating more than $750.  These amounts also constitute "consumer" credit as defined in the Code.  *See* Bankruptcy Code §523(a)(2)(C)(i)(I) (borrowing the definition of "consumer" from the Truth in Lending Act); 15 U.S.C. §1602(h) (Truth in Lending Act's definition of "consumer," meaning "with reference to a credit transaction, . . . one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household expenses").  Although the debtor testified that he could not trace the $17,000 because the money became commingled with other funds when deposited in his checking account, he stated that they were primarily for living expenses and payment of other debts.  Applying a first in, first out (FIFO) tracing rule to the $17,000 deposited in the debtor's checking account, it appears that the money was primarily spent on personal, family, or household expenses.  With the exception of a $3,000 deposit to C&H Carpentry's business checking account, the debtor spent the $17,000 on personal legal fees, medical expenses, and other living expenses.  Accordingly, the $17,000 was an extension of "consumer" credit, and BB&T is entitled to the presumption of non-dischargeability under §523(a)(2)(C)(i)(II).

At trial, BB&T contended that the $17,000 was an extension of "consumer" credit because the line of credit provided to the debtor was a consumer line of credit and is identified by an account number recognized internally by the bank as a consumer account.  The bank's conclusion misses the point.  The focus is not on how the lender conceives of the credit extended, but rather the purpose for which the debtor obtained the cash advances.  Accordingly, had the debtor borrowed the $17,000 here to buy business equipment or retire business-related debts, the mere fact that BB&T lent him money under a "consumer line of credit" is not determinative.  *See John Deere Community Credit Union v. Feddersen (In re Feddersen)*, 270 B.R. 733, 736 (Bankr.N.D.Iowa 2001); *Bank One Columbus, N.A. v. Schad (In re Kountry Korner Store)*, 221 B.R. 265, 269-70 (Bankr.N.D.Okla. 1998).  This requires that the court not merely examine labels, but actually determine the purpose for which cash advances were taken and used, which requirement is consistent with the general view that the discharge exception provisions should be construed narrowly to protect the debtor's right to a fresh start.  *See Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 219 (4th Cir. 2007).

[6] The burden of persuasion ultimately rests with the party that invokes the presumption.  *See* Fed.R.Evid. 301.

(1994) (adopting the *Orecchio* test in an unpublished opinion).

This the debtor has done. He presented uncontroverted testimony that he intended to repay BB&T at the time he drew down the credit line.[7] This is corroborated by the debtor's other evidence. He took the $17,000 in advances from the BB&T credit line in conformity with an established practice in 2006 of drawing down on credit. There is no evidence of luxury purchases or unusual transactions. The advances were at a time when he was opening a new business that he thought would be successful and needed capital to fund the start-up phase. Later, when success was no longer anticipated, he started to liquidate his assets with the intention of paying his debts. He reasonably expected to sell Morning Glory (which was on the market and generated interest at the price of $135,000) and the marital home, and perform on the recently executed Toll Brothers contract, a business in which he had previously been successful. The court is satisfied that the debtor did not contemplate bankruptcy until late November, several weeks after he drew $17,000 from the BB&T credit line. At this time he completed a credit counseling course and consulted with counsel regarding bankruptcy. Moreover, the debtor continued to make payments on the BB&T line of credit, and other credit obligations during the 90-day period preceding the bankruptcy petition. This behavior is inconsistent with a debtor who seeks to "load up" on debt in anticipation of bankruptcy, the practice the presumption of non-dischargeability primarily seeks to prevent. *See Feddersen*, 270 B.R. at 736. Considering the debtor's evidence in totality, the court concludes that the debtor rebutted the presumption of non-dischargeability and proved by the preponderance of the evidence

---

[7] The only evidence that BB&T put on as to the debtor's intent was testimony from the bank's corporate designee, Ms. Holland, that the debtor did not indicate how he was going to use the funds and that she had no first-hand knowledge of how he used those funds. Ms. Holland based her opinion of fraudulent intent on the fact that the debtor was allegedly in the process of filing bankruptcy when he wrote the checks against the credit line, but there was insufficient credible evidence to support this conclusion.

that he intended to repay the borrowed money when he borrowed it and thereafter until he realized that his repayment plans would not materialize. *See Commerce Bank, N.A. v. Fuller (In re Fuller)*, 2007 WL 3245404, *3 (Bankr.D.Kan. Nov. 2, 2007) (concluding that the debtor rebutted the presumption where the evidence showed that the debtor intended to repay the cash advance, continued to pay the lender, and did not consult with counsel regarding bankruptcy until after obtaining the cash advance).

## Conclusion

Looking at the totality of the evidence, the court concludes that the debtor intended to repay the borrowed money when he borrowed it and reasonably had the expected capacity to do so. His reasonable expectations did not materialize. The weight of the evidence establishes the debtor's defense that he lacked fraudulent intent when he took the $17,000 in cash advances from the BB&T line of credit. Accordingly, the court will enter judgment in favor of the debtor and declare the $17,000 debt to BB&T to be discharged.

Alexandria, Virginia
December 5, 2007

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically to:

Deborah S. Kirkpatrick
Jeffrey A. Vogelman
Joseph Timothy Nah
Augustine Kim
13829